# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

01 MAR 30  PM 12: 46

U.S. DISTRICT COURT
N.D. OF ALABAMA

ITPE-NMU/MEBA PENSION FUND and
ITPE-NMU/MEBA ANNUAL BENEFIT
FUND and ITPE-NMU/MEBA HEALTH
AND WELFARE FUND,

      Plaintiffs,

v.

H & R SERVICES, INC.,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.  CV 99-B-3085-NE**

**ENTERED**

MAR 3 0 2001

## MEMORANDUM OPINION

This matter is before the court on the Motion for Summary Judgment filed by plaintiffs ITPE-NMU/MEBA Pension Fund ("Pension Fund"), ITPE-NMU/MEBA Annual Benefit Fund ("Benefit Fund"), and ITPE-NMU/MEBA Health and Welfare Fund ("Health and Welfare Fund").[1] Plaintiffs commenced this action on November 18, 1999, alleging that defendant H & R Services, Inc. ("defendant") violated § 515 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1145 ("ERISA") and § 301 of the Labor-Management Relations Act by failing to make contributions to plaintiffs in accordance with applicable collective bargaining agreements with the Industrial, Technical and Professional Employees Union, AFL-CIO ("the Union"). Plaintiffs seek compensatory damages and plaintiffs ITPE-NMU/MEBA Health and Welfare Fund and ITPE-NMU/MEBA Pension Fund seek a permanent injunction requiring that defendant make contributions in accordance with the agreements.[2]

---

[1] Collectively, these three funds will be referred to as "plaintiffs" or the "Funds."

[2] Because defendant does not currently have a contract with the Annual Benefit Fund, the Annual Benefit Fund is not seeking a permanent injunction.

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that summary judgment is due to be granted in favor of plaintiffs ITPE-NMU/MEBA Health and Welfare Fund and ITPE-NMU/MEBA Pension Fund on their claims for compensatory damages and their request for a permanent injunction. The court is of the opinion that summary judgment is due to be denied on the claims made by ITPE-NMU/MEBA Annual Benefit Fund.

## I. FACTUAL SUMMARY

Defendant is a government contractor, providing management and labor to operate various military facilities. (DX 1 at ¶ 3.) Plaintiffs are jointly administered trust funds created to receive contributions from employers,[3] including defendant, pursuant to collective bargaining agreements which were in force at all times pursuant to the claims made in this action. (PX I, 2 at ¶ 3; PX I, 10 at ¶¶ 3, 5.)[4]   The collective bargaining agreements cover service employees

---

[3] There are approximately 119 employers which contribute to the Health and Welfare Fund, 110 employers which contribute to the Pension Fund, and twenty-six employers which contribute to the Annual Benefit Fund. (PX I, 2 at ¶ 4; PX I, 10 at ¶¶ 4, 6.)

[4] Plaintiffs filed an Evidentiary Submission in Support of Plaintiffs' Motion for Summary Judgment on April 11, 2000, which will be referred to throughout this Memorandum Opinion as "PX I" followed by a comma and the corresponding tab number. Plaintiffs then filed a Second Evidentiary Submission in Support of Plaintiffs' Reply Brief Supporting Plaintiffs' Motion for Summary Judgment on June 2, 2000, which will be referred to throughout this Memorandum Opinion as "PX II" followed by a comma and the corresponding tab number. Plaintiffs also submitted a Third Evidentiary Submission in support of Plaintiffs' Reply Brief Supporting Plaintiffs' Motion for Summary Judgment, which will be referred to throughout this Memorandum Opinion as "PX III" followed by a comma and the corresponding tab number. Plaintiffs filed a Fourth Evidentiary Submission in Support of Plaintiffs' Reply Brief Supporting Plaintiffs' Motion for Summary Judgment on November 20, 2000, consisting of the Affidavit of Taylor Brooks and accompanying exhibits. This submission will be referred to throughout this Memorandum Opinion as "PX IV." Defendant filed an Evidentiary Submission in Opposition to Plaintiffs' Motion for Summary Judgment on May 12, 2000, which will be referred to throughout this Memorandum Opinion as "DX" followed by the corresponding tab letter.

2

employed by defendant at Barbers Point, Hawaii; Eglin Air Force Base, Florida; Fort Indiantown Gap, Pennsylvania; NCO, Fort Stewart, Georgia; NAS Mayport, Florida; Marine Station, Yuma, Arizona; Fort Stewart/Hunter, Georgia; and U.S. Naval Air Station, Fort Worth, Texas. (*See* PX I, 1-13.)  Pursuant to the collective bargaining agreements, defendant agreed to make contributions to the Funds on behalf of its service employees at the military bases listed above and agreed to be bound by the terms and conditions of the Agreements and Declaration of Trust establishing the Funds. (*See* PX I, 1-13.)

Plaintiffs allege that defendant has continuously failed to make contributions in accordance with the terms and conditions of the Agreements and Declarations of Trust establishing the Funds. (PX I, 2; PX I, 10; *see also* Brief in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Br.") at 2-14.)  This is not the first time that defendant has been sued in the Northern District of Alabama for failing to abide by the terms and conditions of the collective bargaining agreement and the Agreements and Declarations of Trust.  Plaintiffs previously sued defendant in 1997, and obtained judgment against defendant for similar breaches. (*See* PX I, 14.)  The specific contributions at issue in this action are described below.

## A.    ITPE-NMU/MEBA Health and Welfare Fund[5]

The Health and Welfare Fund provides health and welfare benefits for employees of

contributing employers, including medical benefits, dental benefits, vision care, disability

income, survivor income, death benefits, and a scholarship program. (PX I, 2 at ¶ 4.)  Section

6.01 of the Agreement and Declaration of Trust establishing the Health and Welfare Fund

provides that all contributions shall be paid to the Trustees of the Fund no later than fifteen days

following the month for which contributions are due.  (PX I, 1 at 15.)  In addition, § 6.02(c) of

the Agreement and Declaration of Trust provides that if payment is not received from an

employer within ten days following the due date, liquidated damages shall be imposed on such

employer at the rate of twenty percent of the amount of unpaid contributions.  (*Id.* at 16.)

Section 6.02(c) also provides for the imposition of interest on the amount due and owing from

such delinquent employer at a rate determined by the Trustees to be the prime rate of interest,

utilizing the guidelines established at § 6621 of the Internal Revenue Code.  (*Id.*)  Moreover,

payments of benefits are suspended to participants whose employers are more than two months

delinquent.  (*Id.* at 7.)

---

[5] The ITPE Health and Welfare Fund was created on July 1, 1971, as the ITPE-NMU
Welfare Plan under an Agreement and Declaration of Trust signed by representatives of the
Industrial, Technical and Professional Employees Division of the National Maritime Union of
America, AFL-CIO and representatives of employers who had entered into collective bargaining
agreements with that union.  (PX I, 2 at ¶ 3; *see also* PX I, 1.)  On June 1, 1989, the name of the
Fund was changed to ITPE-NMU/MEBA Health and Welfare Fund.  (PX I, 2 at ¶ 3.)  On April
23, 1998, the name was changed to ITPE Health and Welfare Fund.  (*Id.*)  The name of the union
has since been changed to the Industrial, Technical and Professional Employees Union, AFL-
CIO.

### 1. **Yuma, Arizona**

Defendant's collective bargaining agreement with the Union included an obligation to make timely contributions to the Health and Welfare Fund for covered service employees at Yuma, Arizona until the agreement at that base expired on December 31, 1999. (PX I, 1 at 15-16; PX I, 2 at ¶ 8; PX I, 3.) Defendant made delinquent contributions for August and September 1999, and has failed to make contributions for October through December 1999. (PX II, 3 at ¶ 6 and Ex. A attached thereto.) The total amount owed by defendant to the Health and Welfare Fund for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at Yuma, Arizona, is $19,606.16. (*Id.*)

Defendant's collective bargaining agreement with the Union also included an obligation to make contributions at a contractually specified rate to the Health and Welfare Fund for covered service employees at Yuma, Arizona. (PX I, 2 at ¶ 16 and Ex. I attached thereto; PX I, 3.) The contractually agreed upon rate at Yuma, Arizona, for the months of January 1999, through May 1999, was $1.39. (*Id.*) Defendant made contributions for the months of January 1999, through May 1999, at the rate of $1.25. (*Id.*) The total amount which defendant underpaid the Health and Welfare Fund because of its failure to make contributions at the agreed upon rate for covered service employees at Yuma, Arizona, is $2,204.29. (*Id.*)

### 2. **U.S. Naval Air Station, Fort Worth, Texas**

Defendant's collective bargaining agreement with the Union included an obligation to make timely contributions to the Health and Welfare Fund for covered service employees at U.S. Naval Air Station, Fort Worth, Texas until the agreement at that base expired on November 30, 1999. (PX I, 1 at 15-16; PX I, 2 at ¶ 9; PX I, 4.) Defendant made delinquent contributions for August and September of 1999, and failed to make contributions for October and November

1999. (PX II, 3 at ¶ 7 and Ex. B attached thereto.) The total amount owed by defendant to the Health and Welfare Fund for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at U.S. Naval Air Station, Fort Worth, Texas, is $5,849.38. (*Id*.)

Defendant's collective bargaining agreement with the Union also included an obligation to make contributions at a contractually specified rate to the Health and Welfare Fund for covered service employees at U.S. Naval Air Station, Fort Worth, Texas. (PX I, 2 at ¶ 18 and Ex. K attached thereto; PX I, 4.) The contractually agreed upon rate at U.S. Naval Air Station, Fort Worth, Texas, for the month of January 1999, was $1.25. (*Id*.) Defendant made its contribution for the month of January 1999, at the rate of $1.10. (PX I, 2 at ¶ 18 and Ex. K attached thereto.) The total amount which defendant underpaid the Health and Welfare Fund because of its failure to make contributions at the agreed upon rate for covered service employees at the U.S. Naval Air Station, Fort Worth, Texas, is $279.05. (*Id.*)

### 3.  NAS Mayport, Florida

Defendant's collective bargaining agreement with the Union includes an obligation to make timely contributions to the Health and Welfare Fund for covered service employees at NAS Mayport, Florida. (PX I, 1 at 15-16; PX I, 2 at ¶ 10; PX I, 5.) Defendant made a delinquent contribution for August 1999, and has failed to make contributions for September 1999, through September 2000. (PX III, 1 at ¶ 6 and Ex. D attached thereto.) The total amount owed by defendant to the Health and Welfare Fund through September 2000, for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at NAS Mayport, Florida, is $39,277.63. (*Id*.)

### 4. Fort Indiantown Gap, Pennsylvania

Defendant's collective bargaining agreement with the Union includes an obligation to make timely contributions to the Health and Welfare Fund for covered service employees at Fort Indiantown Gap, Pennsylvania. (PX I, 1 at 15-16; PX I, 2 at ¶ 11; PX I, 6.) Defendant made delinquent contributions for August 1999, through March 2000, and has failed to make contributions for April through September 2000. (PX III, 1 at ¶ 3 and Ex. A attached thereto.) The total amount owed by defendant to the Health and Welfare Fund through September 2000, for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at Fort Indiantown Gap, Pennsylvania, is $36,985.09. (*Id.*)

Defendant's collective bargaining agreement with the Union also includes an obligation to make contributions at contractually specified rate to the Health and Welfare Fund for covered service employees at Fort Indiantown Gap, Pennsylvania. (PX I, 2 at ¶ 15 and Ex. H attached thereto; PX I, 6.) The contractually agreed upon rate at Fort Indiantown Gap for the months of October 1997, through September 1998, was $1.16. (*Id.*) The contractually agreed upon rate at Fort Indiantown Gap for the months of October 1998, through August 1999, was $1.39. (*Id.*) Defendant made contributions for the months of October 1997, through August 1999, at the rate of $1.00. (PX I, 2 at ¶ 15 and Ex. H attached thereto.) The total amount which defendant underpaid the Health and Welfare Fund because of its failure to make contributions at the agreed upon rate for covered service employees at Fort Indiantown Gap, Pennsylvania, is $14,560.43. (*Id.*)

### 5. NCO Fort Stewart, Georgia

Defendant's collective bargaining agreement with the Union includes an obligation to make timely contributions to the Health and Welfare Fund for covered service employees at

NCO Fort Stewart, Georgia. (PX I, 1 at 15-16; PX I, 2 at ¶ 12; PX I, 7.) Defendant made delinquent contributions for August 1999, through March 2000, and has failed to make contributions for April through September 2000. (PX III, 1 at ¶ 4 and Ex. B attached thereto.) The total amount owed by defendant to the Health and Welfare Fund through September 2000, for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at NCO Fort Stewart, Georgia, is $24,462.62. (*Id.*)

### 6.   Fort Stewart/Hunter, Georgia

Defendant's collective bargaining agreement with the Union includes an obligation to make timely contributions to the Health and Welfare Fund for covered service employees at Fort Stewart/Hunter Georgia. (PX I, 1 at 15-16; PX I, 2 at ¶ 13; PX I, 8.) Defendant made delinquent contributions for August through September 1999, and January through March 2000, and has failed to make contributions for October through December 1999, and April through September 2000. (PX III, 1 at ¶ 5 and Ex. C attached thereto.) The total amount owed by defendant to the Health and Welfare Fund through September 2000, for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at Fort Stewart/Hunter, Georgia, is $106,590.88. (*Id.*)

Defendant's collective bargaining agreement with the Union also includes an obligation to make contributions at a contractually specified rate to the Health and Welfare Fund for covered service employees at Fort Stewart/Hunter Georgia. (PX I, 2 at ¶ 17 and Ex. J attached thereto; PX I, 8.) The contractually agreed upon rate at Fort Stewart/Hunter, Georgia, for the months of July 1998, through September 1998, was $1.25. (*Id.*) Defendant made contributions for the months of July 1998, through September 1998, at the rate of $1.10. (PX I, 2 at ¶ 17 and Ex. J attached thereto.) The total amount which defendant underpaid the Health and Welfare

8

Fund because of its failure to make contributions at the agreed upon rate for covered service employees at Fort Stewart/Hunter, Georgia, is $3,267.29. (*Id.*)

### 7.   **Eglin Air Force Base**

Defendant's collective bargaining agreement with the Union included an obligation to make timely contributions to the Health and Welfare Fund for covered service employees at Eglin Air Force Base. (PX I, 1 at 15-16; PX I, 2 at ¶ 14; PX I, 13.) Defendant has failed to make contributions for February and March 1999, for covered service employees at Eglin Air Force Base. (PX II, 3 at ¶ 15 and Ex. G attached thereto.) The total amount owed by defendant to the Health and Welfare Fund for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at Eglin Air Force Base is $12, 629.61. (*Id.*)

### B.   **ITPE-NMU/MEBA Pension Fund[6]**

The Pension Fund provides retirement benefits for employees of contributing employers. (PX I, 10 at ¶ 4.) Section 7.01 of the Agreement and Declaration of Trust establishing the Pension Fund provides that all contributions shall be submitted to the Trustees of the Fund no later than fifteen days following the month for which contributions are due. (PX I, 9 at 17.) In addition, § 7.02(c) of the Agreement and Declaration of Trust provides that if payment is not received from an employer within ten days following the due date, liquidated damages shall be

---

[6] The ITPE Pension Fund was created in October 1979, under an Agreement and Declaration of Trust signed by representatives of the Industrial, Technical and Professional Employees Division of the National Maritime Union of America, AFL-CIO and representatives of employers who had entered into collective bargaining agreements with that union. (PX I, 10 at ¶ 3; *see also* PX I, 9.) On June 1, 1989, the name of the fund was changed to ITPE-NMU/MEBA Pension Fund. (*Id.*) On April 23, 1998, the name was changed to ITPE Pension Fund. (*Id.*) The name of the union has since been changed to Industrial, Technical and Professional Employees Union, AFL-CIO. (*Id.*)

9

imposed on such employer at the rate of twenty percent of the amount of unpaid contributions. (*Id.* at 18.) Section 7.02(c) also provides for the imposition of interest on the amount due and owing from such delinquent employer at the rate of one and a half percent per month. (*Id.*)

A participant's retirement benefit is based on the amounts contributed on his or her behalf. (PX I, 10 at ¶ 9.) If contributions are not received on a timely basis, there is a delay in crediting a participant's account, and the participant fails to receive the benefit of the interest earned on the Pension Fund's investments which is allocated to each individual on a pro rata basis. (*Id.*)

### 1.   **Yuma, Arizona**

Defendant's collective bargaining agreement with the Union included an obligation to make timely contributions to the Pension Fund for covered service employees at Yuma, Arizona, until the agreement at that base expired on December 31, 1999. (PX I, 3;  PX I, 9 at 17-18; PX I, 10 at ¶ 11; PX II, 4 at ¶ 6.) Defendant made delinquent contributions for April through July 1999, and failed to make contributions for August through December 1999. (PX II, 4 at ¶ 6 and Ex. A attached thereto.) The total amount owed by defendant to the Pension Fund for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at Yuma, Arizona, is $11,739.76. (*Id.*)

### 2.   **U.S. Naval Air Station, Fort Worth, Texas**

Defendant's collective bargaining agreement with the Union included an obligation to make timely contributions to the Pension Fund for covered service employees at U.S. Naval Air Station, Fort Worth, Texas, until the agreement at that base expired on November 30, 1999. (PX I, 4; PX I, 9 at 17-18; PX I, 10 at ¶ 12; PX II, 4 at ¶ 7.) Defendant made delinquent contributions for April through July 1999, and failed to make contributions for August through November

10

1999. (PX II, 4 at ¶ 7 and Ex. B attached thereto.)  The total amount owed by defendant to the

Pension Fund for its failure to make timely contributions, including interest and liquidated

damages, for covered service employees at the U.S. Naval Air Station, Fort Worth, Texas, is

$5,094.92.  (*Id.*)

### 3.    Fort Indiantown Gap, Pennsylvania

Defendant's collective bargaining agreement with the Union includes an obligation to

make timely contributions to the Pension Fund for covered service employees at Fort Indiantown

Gap, Pennsylvania.  (PX I, 6; PX I, 9 at 17-18; PX I, 10 at ¶ 13.)  Defendant made delinquent

contributions for April through July 1999, and January through February 2000, and failed to

make contributions for August through December 1999, and March through September 2000.

(PX III, 2 at ¶ 3 and Ex. A attached thereto; PX II, 4 at ¶¶ 8-9.)  Thus, the current amount due to

the Pension Fund for its failure to make timely contributions, including interest and liquidated

damages, for covered service employees at Fort Indiantown Gap, Pennsylvania, through

September 2000, is $21,029.28.  (*Id.*)

### 4.    Fort Stewart/Hunter

Defendant's collective bargaining agreement with the Union includes an obligation to

make timely contributions to the Pension Fund for covered service employees at Fort

Stewart/Hunter.  (PX I, 8; PX I, 9 at 17-18; PX I, 10 at ¶ 14.)  Defendant made delinquent

contributions for April through July 1999, and January through February 2000, and failed to

make contributions for August through December 1999, and March through September 2000.

(PX II, 4 at ¶ 10; PX III, 2 at ¶ 5 and Ex. C attached thereto.)  Thus, the current amount due to

the Pension Fund for its failure to make timely contributions, including interest and liquidated

damages, for covered service employees at Fort Stewart/Hunter through September 2000, is

$55,994.22.  (*Id.*)

### 5.   **NCO Fort Stewart**

Defendant's collective bargaining agreement with the Union includes an obligation to make timely contributions to the Pension Fund for covered service employees at NCO Fort Stewart.  (PX I, 7; PX I, 9 at 17-18; PX I, 10 at ¶ 16.)  Defendant has made delinquent contributions for April 1999, through February 2000, and has failed to make contributions for March through September 2000.  (PX II , 4 at ¶ 12; PX III, 2 at ¶ 4 and Ex. B attached thereto.) Thus, the current amount due to the Pension Fund for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at NCO Fort Stewart through September 2000, is $10,661.51.  (*Id.*)

### 6.   **NAS Mayport, Florida**

Defendant's collective bargaining agreement with the Union includes an obligation to make timely contributions to the Pension Fund for covered service employees at NAS Mayport, Florida.  (PX I, 5; PX I, 9 at 17-18; PX I, 10 at ¶ 15.)  Defendant made delinquent contributions for April through July 1999, and failed to make contributions from August 1999, through September 2000.  (PX II, 4 at ¶ 11; PX III, 2 at ¶ 6 and Ex. D attached thereto.)  The total amount owed by defendant to the Pension Fund for its failure to make timely contributions, including interest and liquidated damages, for covered service employees at NAS Mayport through September 2000, is $19,247.69.  (*Id.*)

12

## C.   ITPE-NMU/MEBA Annual Benefit Fund[7]

The Annual Benefit Fund provides vacation, holiday, sick leave, and other benefits for employees of contributing employers.  (PX I, 10 at ¶ 6.)  Section 7.01 of the Agreement and Declaration of Trust establishing the Annual Benefit Fund provides that all contributions shall be submitted to the Trustees of the Fund no later than fifteen days following the month for which contributions are due.  (PX I, 11 at 18.)  In addition, § 7.02(c) of the Agreement and Declaration of Trust provides that if payment is not received from an employer within ten days following the due date, liquidated damages shall be imposed on such employer at the rate of twenty percent of the amount of unpaid contributions.  (*Id.* at 19.)  Section 7.02(c) also provides for the imposition of interest on the amount due and owing from such delinquent employer at the rate of one and a half percent per month.  (*Id.*)

Defendant's collective bargaining agreement with the Union included an obligation to make timely contributions to the Annual Benefit Fund for covered service employees at Barbers Point during the months of April 1998, through March 1999.  (PX I, 10 at ¶ 10 and Ex. G attached thereto; PX I, 12.)  Plaintiffs allege that defendant failed to make contributions to the Annual Benefit Fund for any of the aforementioned months.  (PX I, 10 at ¶ 10 and Ex. G attached thereto.)  Defendant alleges that it made these payments directly to the employees instead of to the Annual Benefit Fund.  (DX 1 at ¶ 16 and Ex. D; *see also* Def.'s Br. at 8.)  Defendant claims that the Department of Labor investigated the alleged failure to make these

---

[7]   The ITPE Annual Benefit Fund was created in April 1986, under an Agreement and Declaration of Trust signed by representatives of employers who had entered into a collective bargaining agreement with that union.  (PX I, 10 at ¶ 5; *see also* PX I, 11.)  On June 1, 1989, the name of the fund was changed to ITPE-NMU/MEBA Benefit Fund.  (*Id.*)  On April 23, 1998, the name of the fund was changed to ITPE Benefit Fund.  (*Id.*)

13

payments and concluded that defendant had paid the employees all that they were owed.  (*Id.*) The total amount which the Annual Benefit Fund alleges that defendant owes for its failure to make timely contributions for covered service employees at Barbers Point, including interest and liquidated damages, is $56,702.78.  (PX I, 10 at ¶ 10 and Ex. G attached thereto.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

14

## III.   DISCUSSION

The court has jurisdiction over this action pursuant to § 301 of the Labor Management
Relations Act and § 502 of ERISA.  Section 301(a) of the Labor Management Relations Act
provides a federal forum for suits to enforce labor contracts, including pension and welfare
agreements.  *See Korzen v. Local Union 705, International Brotherhood of Teamsters,* 75 F.3d
285, 288 (7th Cir. 1996) ("Section 301 confers jurisdiction to hear a suit from breach of contract
between an employer and a labor organization (that is, a collective bargaining contract) or
between two labor organizations."); *see also United Automobile, Aerospace and Agricultural
Implement Workers of America, Local 33 v. R.E. Dietz Co.,* 996 F.2d 592, 595 (2d Cir. 1993)
("Section 301 covers suits for violation of contracts between an employer and a labor
organization.").  Because plaintiffs allege that defendant has breached the collective bargaining
agreements, the Labor Management Relations Act provides plaintiffs with a federal forum to
remedy any violations of the aforementioned agreements.  *See Central States, Southeast and
Southwest Areas Pension Fund v. Behnke, Inc.,* 883 F.2d 454, 464 (6th Cir. 1989) (In action
brought, in part, under the Labor Management Relations Act, defendant employer was held
"liable for its delinquent contributions.").

Defendant "act[s] directly as an employer, or indirectly in the interest of an employer, in
relation to an employee benefit plan," and therefore qualifies as an "employer" within the
meaning of ERISA.  29 U.S.C. § 1002(5).  Moreover, because defendant is involved in "[an]
activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct
commerce," it is engaged in an "industry or activity affecting commerce" within the meaning of
ERISA.  29 U.S.C. § 1002(12).

15

As defined by ERISA, an "employee pension benefit plan" is any "plan, fund, or program . . . maintained by an employer or by an employee organization [which] (i) provides retirement income to employees." 29 U.S.C. § 1002(2)(A)(i). Because the Pension Fund provides retirement benefits for employees of contributing employers, it is an "employee pension benefit plan" within the meaning of ERISA. 29 U.S.C. § 1002(2)(A)(i).

As defined by ERISA, an "employee welfare benefit plan" is any "plan, fund, or program . . . maintained by an employer or by an employee organization . . . for the purpose of providing for its participants or their beneficiaries . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits . . . ." 29 U.S.C. § 1002(l). As noted above, the Annual Benefit Fund provides vacation, holiday, sick leave, and other benefits for employees of contributing employers, (PX I, 10 at ¶ 6), and the Health and Welfare Fund provides health and welfare benefits for employees of contributing employers, which include medical benefits, dental benefits, vision care, disability income, survivor income, death benefits, and a scholarship program, (PX I, 2 at ¶ 4). Thus, the Annual Benefit Fund and the Health and Welfare Fund are "employee welfare benefit plans" within the meaning of ERISA. 29 U.S.C. § 1002(l).

As defined by ERISA, a "multiemployer plan" is a plan "(i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and one or more employers, and (iii) which satisfies such other requirements as the Secretary may prescribe by regulation." 29 U.S.C. § 1002(37)(A). There are approximately 119 employers which contribute to the Health and Welfare Fund, 110 employers which contribute to the Pension Fund, and twenty-six employers which contribute to the Annual Benefit Fund. (PX I, 2 at ¶ 4; PX I, 10

at ¶¶ 4, 6.)  Thus, all plaintiffs are "multi-employer plans" within the meaning of ERISA.  *See* 29

U.S.C. § 1002(37)(a).

The failure of an employer to make its required contributions and abide by the terms of

its agreements with a multi-employer plan is a violation of ERISA.  *See* 29 U.S.C. ¶ 1145

("Every employer who is obliged to make contributions to a multiemployer plan under the terms

. . . of a collectively bargained agreement shall . . . make such contributions in accordance with

the terms and conditions of such . . . agreement.").  In the event that an employer fails to make

contributions in accordance with the terms and conditions of such agreement, a multi-employer

plan is entitled to damages and equitable relief as follows:

> In any action under this subchapter by a fiduciary for or on
> behalf of a plan to enforce section 1145 of this title in which a
> judgment in favor of the plan is awarded, the court shall award the
> plan–
>> (A) the unpaid contributions,
>> (B) interest on the unpaid contributions,
>> (C) an amount equal to the greater of–
>>> (i) interest on unpaid contributions, or
>>> (ii) liquidated damages provided for under the
>>>     plan in an amount not in excess of 20 percent . .
>>>     of the amount determined by the court under
>>>     subparagraph (A),
>> (D) reasonable attorney's fees and costs of the action,
>>     to be paid by the defendant, and
>> (E) such other legal or equitable relief as the court
>>     deems appropriate.

29 U.S.C. § 1132(g)(2).

## A.   Contributions to the Health and Welfare Fund

Defendant does not dispute that it failed to make timely contributions to the Health and

Welfare Fund, nor does it dispute that it made contributions to the Health and Welfare Fund at

rates lower than the contractually agreed upon rates.  Defendant's only response to plaintiffs'

17

Motion for Summary Judgment is that the amounts sought by the Health and Welfare Fund were based, in part, on estimates and not on actual Union Reports detailing the hours worked by each covered employee. (*See* Defendant's Response to Plaintiffs' Motion for Summary Judgment ("Def.'s Br.") at 2-10.) Subsequent evidentiary submissions by the Health and Welfare Fund, however, included amounts owed to it by defendant based entirely on information in the Union Reports, not on estimates.[8] (*See* Supplement to Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Summary Judgment and exhibits attached thereto; PX I; PX II; PX III; and PX IV.) Thus, the undisputed amount due to the Health and Welfare Fund for all the bases combined through September 2000, is $265,712.43. Therefore, summary judgment is due to be granted in favor of the Health and Welfare Fund in the amount of $265,712.43.

**B.    Contributions to the Pension Fund**

Likewise, defendant does not dispute that it failed to make timely contributions to the Pension Fund. Defendant's only response to plaintiffs' Motion for Summary Judgment is that the amounts sought by the Pension Fund were based, in part, on estimates and not on actual Union Reports detailing the hours worked by each covered employee. (*See* Def.'s Br. at 2-10.) Subsequent evidentiary submissions by the Pension Fund, however, included amounts owed to it

---

[8] Even if the amounts sought by the Health and Welfare Fund were based on estimates, this fact would not preclude the entry of summary judgment. Defendant failed to produce the Union Reports to plaintiffs by the time plaintiffs filed their Motion for Summary Judgment despite being required to do so by the Declaration of Trust establishing the Health and Welfare Fund and plaintiffs' discovery requests. It is well established that "[a] defendant whose wrongful conduct has caused the difficulty in assessing damages cannot complain that the damages are somewhat speculative." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 526 (10th Cir. 1987); *see also Story Parchment Co. v. Patterson Parchment Paper* Co., 282 U.S. 555, 563 (1931); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927); *Bangor Punta Operations of New York, Inc. v. Universal Marine Co.*, Ltd., 543 F.2d 1107, 1110-11 (5th Cir. 1976).

based entirely on information in the Union Reports and not on estimates.[9] (*See* Supplement to Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Summary Judgment and exhibits attached thereto; PX I; PX II; PX III; and PX IV.) Thus, the undisputed amount due to the Pension Fund for all the bases combined through September 2000, is $123,767.27. Therefore, summary judgment is due to be granted in favor of the Pension Fund in the amount of $123,767.27.

## C.    Contributions to the Annual Benefit Fund

The Annual Benefit Fund alleges that defendant has failed to make contributions for covered service employees at Barbers Point, Hawaii, pursuant to its collective bargaining agreement with the Union and the Agreement and Declaration of Trust. (PX I, 10 at ¶ 10 and Ex. G attached thereto; *see also* Pls' Br. at 14, 24; *see also* Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Summary Judgment ("Pls.' Reply") at 17.) In response, defendant states that it made such payments directly to the employees. (DX 1 at ¶ 16 and Ex. D; *see also* Def.'s Br. at 8.) Defendant claims that the Department of Labor investigated the alleged failure to make these payments and concluded that defendant had paid the employees all that they were owed. (*Id.*) Because an issue of material fact exists as to this claim,[10] summary judgment is not appropriate at this time. Thus, summary judgment is due to be denied as to the Annual Benefit Fund's claim for compensatory damages.

---

[9] Even if the amounts sought by the Pension Fund were based on estimates, summary judgment would still be granted for the same reasons cited above for the Health and Welfare Fund.

[10] Pursuant to the court's Order dated March 6, 2001, plaintiff ITPE-NMU/MEBA Annual Benefit Fund was directed to file a supplemental Motion for Summary Judgment regarding this claim.

19

**D.     Permanent Injunction**

The Health and Welfare Fund and Pension Fund seek a permanent injunction requiring

defendant: (a) to make timely contributions as required by the Agreements and Declarations of

Trust; (b) to make contributions at the contractually agreed upon rates at all locations; and

(c) to make contributions at all locations for hours of paid vacation, holidays, and sick leave for

its covered service employees.

### 1.     Exercise of Equity Jurisdiction

In order to meet their burden of demonstrating that the court's exercise of equity

jurisdiction is proper, the Health and Welfare Fund and the Pension Fund must show that:

(1) they have no adequate legal remedy; (2) the threatened injury is real, not imagined; and (3)

no equitable defenses exist. *Clark Const. Co., Inc. v. Pena*, 930 F. Supp. 1470, 1477-78 (M.D.

Ala. 1996).

#### a.     *No Adequate Legal Remedy*

Defendant's continuous breach of the terms of the collective bargaining agreements

establishes that the Health and Welfare Fund and Pension Fund have no adequate legal remedy.

Plaintiffs successfully sued defendant in 1997 for similar breaches, and, instead of ceasing such

conduct, defendant continued its refusal to honor its agreements. Defendant's past history

suggests a high likelihood that defendant will continue to fail to abide by the agreements. Not

only does defendant already have one previous judgment against it, defendant has been

delinquent on its payments, including a one year delinquency on payments for covered service

employees at NAS Mayport, Florida. (PX I, 14; ; PX II, 3 at ¶¶ 6-7, 15 and Ex. A-B, G attached

thereto; PX II, 4 at ¶¶ 6-12 and Ex. A-B attached thereto; PX III, 1 at ¶¶ 3-6 and Ex. A-D

attached thereto; PX III, 2 at ¶¶ 3- 6 and Ex. A-D attached thereto.) Thus, an award of monetary

damages is not likely to deter defendant from breaching the agreements.

Defendant argues that if future violations occur, the Health and Welfare Fund and the Pension Fund can file another lawsuit. (*See* Def.'s Br. at 10) ("Plaintiffs have failed to demonstrate that they have no adequate legal remedy. Contrary to Plaintiffs' assertions, they have not been forced to file a separate claim for damages for each alleged injury. . . . Plaintiffs' legal recourse is the very contract for which they have filed the present action.") However, a "legal remedy is inadequate if the plaintiff's injury is a continuing one, where the best available remedy at law would relegate the plaintiff to filing a separate claim for damages each time it is injured anew." *Northeast Women's Center, Inc. v. McMonagle*, 665 F. Supp. 1147, 1153 (E.D. Pa. 1987) (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure*, at § 2944, at 398).

The established policy of the Health and Welfare Fund is to suspend payments of benefits to participants whose employers are more than two months delinquent. (PX I, 1 at 7.) The participants are then denied having medical and other benefits paid on a timely basis and, therefore, have no legal recourse to correct this loss. Furthermore, a participant's retirement benefit under the Pension Fund is based on the amount of contributions contributed on his or her behalf. (PX I, 10 at ¶ 9.) If contributions are not received on a timely basis, there is a delay in crediting a participant's account which means that the participant fails to receive the pro rata benefit of the interest earned on the Pension Fund's investments. (*Id.*) This also means that no legal remedy can adequately compensate covered service employees for such losses.

Defendant also argues that because the Agreements and Declarations of Trust for the Health and Welfare Fund and the Pension Fund provide for the imposition of interest and liquidated damages, there is an adequate remedy at law. (*See* Def.'s Br. at 10-11.) However, this argument ignores the aforementioned injuries suffered by the Health and Welfare Fund and

21

the Pension Fund for which interest and liquidated damages cannot fully compensate.

As noted above, the court is also awarding judgment against defendant and in favor of the Health and Welfare Fund for $265,712.43, and in favor of the Pension Fund for $123,767.27. Defendant's representations to the court imply that it will not be able to entirely satisfy this judgment. Moreover, defendant's mounting delinquencies make it likely that any future judgment would be practically worthless. *See Central States*, 511 F. Supp. at 42 ("The inadequacy of any remedy at law is further indicated by defendants' admittedly precarious financial condition, thereby increasing the likelihood that they will be unable to satisfy any judgment ultimately rendered by the court."). For the reasons stated above, the court is of the opinion that plaintiffs have no adequate remedy at law.

### b.      *Threatened Injury*

The threatened injury to plaintiffs is real, not imagined. Further, the harm is not merely potential; rather, it is immediate. The undisputed evidence demonstrates that defendant has breached the terms of its agreements at eight different bases, and that plaintiffs have previously sued defendant in 1997 for similar breaches. (PX I, 2 at ¶¶ 15-18 and Ex. H-K attached thereto; PX I, 14; PX II, 3 at ¶¶ 6-7, 15 and Ex. A-B, G attached thereto; PX II, 4 at ¶¶ 6-12 and Ex. A-B attached thereto; PX III, 1 at ¶¶ 3-6 and Ex. A-D attached thereto; PX III, 2 at ¶¶ 3-6 and Ex. A-D attached thereto.) Thus, unless the court issues an injunction, defendant will continue to breach its agreements and plaintiffs will continue to lose the investment moneys and investment opportunities associated with defendant's timely contributions.

### c.      *Equitable Defenses*

Defendant was obligated to make contributions in accordance with its agreements with the Health and Welfare Fund and the Pension Fund, but has failed to do so. Defendant argues that

because it has engaged in a good faith effort to make contributions to the Health and Welfare

Fund and the Pension Fund, it has not engaged in conduct which rises to the level of bad faith

warranting the imposition of a permanent injunction. Counsel for defendant suggests that

defendant has failed to make the contributions because "outstanding invoices" have not been

paid. However, neither defendant nor counsel for defendant has produced any evidence

supporting such allegation.

Moreover, evidence in the record demonstrates that defendant has been fully paid on a

number of the contracts on which defendant has failed to make contributions. (*See* PX IV at ¶¶

2-3.) The Contracting Officer for defendant's contracts with Yuma, Arizona, and U.S. Naval Air

Station, Fort Worth, Texas, stated that defendant has been paid through the end of its contracts

for both of these bases.[11] (PX IV at ¶¶ 2- 4 and Ex. A attached thereto.) Yet, despite receiving

payment on these two contracts, defendant has failed to make contributions to the Health and

Welfare Fund for covered service employees at Yuma, Arizona, for October through December

1999, and has not made contributions to the Pension Fund for August through December 1999.

(PX II, 3 at ¶ 6 and Ex. A attached thereto; PX II, 4 at ¶ 6 and Ex. A attached thereto.)

Additionally, the Contracting Officer for defendant's contract at Fort Indiantown Gap,

Pennsylvania, stated that defendant has been fully paid through September 2000. (PX IV at ¶¶

2-5 and Ex. B attached thereto.) Yet, defendant has not in turn made contributions for covered

service employees at Fort Indiantown Gap, Pennsylvania, to the Health and Welfare Fund for

April through September 2000, or to the Pension Fund for August through December of 1999,

---

[11] The evidence before the court establishes only one outstanding payment to defendant, which consists of a wage adjustment for December 1999, for the contract at Yuma, Arizona. (PX IV at ¶ 4 and Ex. A attached thereto, ¶ 5.) This amount is less than $2,000. (*Id.*)

23

and March through September 2000. (PX III, 1 at ¶ 3 and Ex. A attached thereto; PX III, 2 at ¶ 3 and Ex. A attached thereto.) This evidence suggests that defendant is not acting in good faith, and such conduct is sufficient to warrant the entry of a permanent injunction.[12]

> d.    Conclusion

Defendant's continuous failure to abide by the terms the collective bargaining agreement and the Agreements and Declaration of Trust, despite having been previously sued by plaintiffs in 1997 for similar misconduct, demonstrates a high likelihood that defendant will not comply with these agreements in the future. The court is of the opinion that the harm threatened against plaintiffs is real and no adequate remedy exists at law. Further, defendant has no valid legal or equitable defense for its failure to make proper contributions. Therefore, the court has proper equitable jurisdiction.

## 2.    **Permanent Injunction Standard**

The court's discretionary authority to grant injunctive relief is well established under ERISA. *See* 29 U.S.C. § 1132(a)(3). The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the movant must demonstrate actual success on the merits rather than merely show a likelihood of success on the merits. *See Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n.12 (1987). Thus, the standard requires the court to find: (1) that plaintiffs are successful on the merits; (2) that a substantial threat exists that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiffs outweighs the threatened harm the injunction

---

[12] Defendant also argues that an injunction will not change its financial ability to make contributions. However, a contempt hearing may force defendant to account for those payments it has received, but has in turn failed to make contributions for the corresponding months.

may do to defendant; and (4) that granting the permanent injunction will not disserve the public interest. *Clark Construction Co.,* 930 F. Supp. at 1477.

a.    *Success on the Merits*

It is undisputed that the collective bargaining agreements and the Agreements and Declarations of Trust at issue require that defendant make timely contributions at all locations at contractually agreed upon rates and that defendant make contributions at all locations for hours of paid vacation, holidays, and sick leave for its covered service employees. Defendant concedes as much in its response to plaintiffs' Motion for Summary Judgment. (Def.'s Br. at 2-10.) Further, at oral argument, defendant conceded that it has breached the collective bargaining agreements and that it owes money to the Health and Welfare Fund and the Pension Fund at the bases discussed above. Thus, the Health and Welfare Fund and the Pension Fund have demonstrated actual success on the merits.

b.    *Irreparable Injury*[13]

The Health and Welfare Fund and the Pension Fund must demonstrate a substantial threat that they will suffer irreparable injury if the injunction is not granted. Defendant has continuously failed to make timely contributions to the Health and Welfare Fund and the Pension Fund. (PX II, 3 at ¶¶ 6-7, 15 and Ex. A-B, G attached thereto; PX II, 4 at ¶¶ 6-12 and

---

[13] The court notes that if the damages are calculable in money, then the injury is not irreparable. *See Clark Construction Co.,* 930 F. Supp. at 1490. In fact, "the principal and overriding element of this prerequisite is irreparable harm resulting from the absence of an adequate remedy at law. . . . Hence, the doctrine that the legal remedy must be inadequate before equity will act is inextricably intertwined with the irreparable injury element." *Id.* (citations and quotations omitted). In section III(D)(1)(a) of this Memorandum Opinion, the court concluded that the Health and Welfare Fund and the Pension Fund have no adequate legal remedy for the injuries relating to defendant's continuous failure to make timely contributions pursuant to the terms of the agreements at issue. Thus, the analysis under that section of this Memorandum Opinion is "inextricably intertwined" with the analysis regarding the irreparable injury element.

25

Ex. A-B attached thereto; PX III, 1 at ¶ 3-6 and Ex. A-D attached thereto; PX III, 2 at ¶¶ 3- 6 and Ex. A-D attached thereto.)  At the NAS Mayport, Florida base, defendant is at least one year behind in its contributions to both the Health and Welfare Fund and the Pension Fund.  (PX II, 2 at ¶ 6 and Ex. D attached thereto; PX III, 1 at ¶ 6 and Ex. D attached thereto.)  At the other bases which are still under contract, defendant is at least five months behind.  (PX II, 4 at ¶¶ 8-12; PX III, 1 at ¶¶ 3-6 and Ex. A-D attached thereto; PX III, 2 at ¶¶ 3- 6 and Ex. A-D attached thereto.)  Moreover, defendant has failed to fulfill the required contributions for those bases whose agreements have terminated.  (PX II, 3 at ¶¶ 6-7, 15 and Ex. A-B, G attached thereto; PX II, 4 at ¶¶ 6-7 and Ex. A-B attached thereto.)   In addition, many of the contributions defendant paid were calculated using a rate lower than contractually agreed upon.  (PX I, 2 at ¶¶ 15-18 and Ex. H-K attached thereto; PX I, 4; PX I, 6; PX I, 8; PX I, 3.)

Defendant's continuous failure to abide by the terms the collective bargaining agreement and the Agreements and Declaration of Trust, despite having been previously sued by plaintiffs in 1997 for similar misconduct, demonstrates a high likelihood that defendant will not comply with these agreements in the future, even if a judgment is entered against it.  Thus, in order to ensure future compliance, the Health and Welfare Fund and the Pension Fund would be forced to file another lawsuit.  "If a plaintiff can secure legal relief only through a multiplicity of lawsuits, plaintiff has suffered irreparable harm sufficient to warrant . . . a[n] injunction." *Ecolab, Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D. N.Y. 1991); *see also McMonagle*, 665 F. Supp. at 1153 ("legal remedy is inadequate if the plaintiff's injury is a continuing one, where the best available remedy at law would relegate the plaintiff to filing a separate claim for damages each time it is injured anew").  Additionally, the loss of investment moneys and investment opportunities constitutes further irreparable injury to the Health and Welfare Fund and the Pension Fund.  *See*

26

*Van Drivers*, 551 F.Supp. at 433. Not only do these funds lose the benefit of investments and opportunities as a result of defendant's failure to make timely contributions, the plan participants are irreparably harmed as well. Thus, the court is of the opinion that the absence of a permanent injunction will result in irreparable harm to plaintiffs.

    *c.*  *Threatened Injury to Plaintiffs Outweighs Harm to Defendant*

  Additionally, requiring defendant to abide by the terms of the agreements does no harm to defendant. Conversely, failure to require defendant to abide by the agreements substantially harms the Health and Welfare Fund and the Pension Fund because it causes a monetary shortfall in the funds maintained for service employees. The Funds have already lost the benefit of investment moneys and investment opportunities, and without the permanent injunction, it is likely that they will continue to lose such benefits. Thus, the threatened injury to the Health and Welfare Fund and the Pension Fund outweighs threatened harm the injunction may do to defendant.

    *d.*  *Public Interest*

  Moreover, requiring defendant to abide by the agreements would not disserve the public interest. On the contrary, it would promote the public interest in that covered service employees would have proper contributions made to their Health and Welfare Fund and Pension Fund. In weighing the equitable considerations for the issuance of an injunction and considering first the matter of public policy, the court looks to the language of ERISA wherein "Congress finds . . . that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest . . . ." 29 U.S.C. §1001(a). ERISA specifically provides equitable remedies for nonpayment of contributions to a fund when such payments are required under a collective bargaining

27

agreement. Thus, when an employer is not abiding by its contractual obligations to an employee benefit fund, ERISA permits a court to grant "such other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g)(2)(E). This language is "unambiguous evidence of Congress' express intent to permit federal courts to issue injunctions." *See Laborers Fringe Benefit Funds – Detroit and Vicinity v. Northwest Concrete & Construction, Inc.,* 640 F.2d 1350, 1351-52 (6th Cir. 1981). In view of this statutory provision, many federal courts have granted injunctive relief to participants and beneficiaries under ERISA to enjoin employers from refusing to comply with employee benefit provisions of labor agreements. *See e.g., Laborers Fringe,* 640 F.2d at 1352 (reversing a district court's refusal to grant an injunction); *Van Drivers Union Local No. 392 v. Neal Moving & Storage,* 551 F. Supp. 429 (N.D. Ohio 1982);[14] *Central States, Southeast and Southwest Areas Pension Fund v. Admiral Merchants Motor Freight, Inc.,* 511 F. Supp. 38 (D. Minn. 1980).

ERISA was intended to stabilize the rights and liabilities of pension plans established by collective bargaining. *Central States Southeast and Southwest Areas Pension Fund v. Hitchings Trucking, Inc.,* 472 F. Supp. 1243, 1247 (E.D. Mich. 1979). The continued stability of such a plan is precisely what is at stake in the present case. Congressional intent and public policy are

---

[14] The facts of this case are very similar to those in *Van Drivers*. In *Van Drivers*, the employee benefit plan and the employee Union sought compensatory damages and injunctive relief from the employer for failure to make contributions in accordance with the agreements. *Id.* at 430. The *Van Drivers* court granted injunctive relief to the plaintiffs for many of the same reasons in which plaintiffs in the case at bar are entitled to injunctive relief. First, the court noted that there had been previous litigation between the parties on this same issues. *Id.* at 432. Second, the court stated that the loss of investment income constituted an irreparable injury to the employee benefit fund and the employees who were losing the benefit of the investment of this money. *Id.* at 433. Third, the court observed that the defendant's mounting delinquencies were undermining the stability of the employee benefit fund. *Id.* at 432. All of the above-mentioned factors in the *Van Drivers* contributed to a finding that the employee benefit fund would suffer irreparable harm absent injunctive relief. All of the factors cited in *Van Drivers* are present in this case as well.

important considerations which guide the court in determining the necessity of the injunction in the instant case. It is clear that the "stability and protection" to be afforded by these plans require "assurance of adequate funding." *See Central States Southeast and Southwest Areas Pension and Health & Welfare Funds v. McNamara Motor Express, Inc.*, 503 F. Supp. 96, 98 (W.D. Mich. 1980). Defendant's steadily mounting delinquencies undermine the stability of the Health and Welfare Fund and the Pension Fund. Thus, the continued vitality and stability of the Health and Welfare Fund and the Pension Fund are dependent upon defendant's fulfillment of its obligations under the collective bargaining agreement. Therefore, requiring defendant to abide by the collective bargaining agreements and the Agreements and Declarations of Trust would not disserve the public interest.

### 3.    **Conclusion**

The Health and Welfare Fund, the Pension Fund, and the plan participants are being irreparably harmed by losing the benefit of contributions and being forced to resort to litigation in order to resolve these issues. Furthermore, defendant's breaches of the collective bargaining agreements have been continuous, repeated, and flagrant. For the foregoing reasons, the court is of the opinion that the permanent injunction requested by the Health and Welfare Fund and the Pension Fund is due to be granted.

### E.    **Attorney's Fees**

The Health and Welfare Fund and the Pension Fund also seek an award of attorney's fees for fees incurred in this litigation. Defendant has failed to assert any reason as to why it should not be required to pay reasonable attorney's fees. Moreover, 29 U.S.C. § 1132(g)(2) mandates that reasonable attorney's fees "shall" be awarded upon an entry of judgment against the defendant. Because the court has concluded that the Health and Welfare Fund and the Pension

Fund are entitled to summary judgment, the court further concludes that they are entitled to reasonable attorney's fees and costs of the action to be paid by defendant pursuant to 29 U.S.C. § 1132(g)(2). The Health and Welfare Fund and the Pension Fund shall submit their claims for attorney's fees, together with supporting evidence, to the court within twenty days of the entry of this Memorandum Opinion and corresponding Order.

## IV. CONCLUSION

Defendant raises no genuine issue of material fact regarding the claims of the Health and Welfare Fund and the Pension Fund for damages and a permanent injunction. Accordingly, summary judgment is due to be granted in favor of the Health and Welfare Fund and against defendant in the amount of $265,712.43, and in favor of the Pension Fund and against defendant in the amount of $123,767.27. In addition, the Health and Welfare Fund and the Pension Fund are entitled to a permanent injunction requiring that defendant (a) make timely contributions as set forth in the Agreements and Declarations of Trust; (b) make contributions at the contractually agreed upon rates at all locations; and (c) make contributions at all locations for hours of paid vacation, holidays, and sick leave for its covered service employees. Because defendant has raised a genuine issue of material fact regarding the claims made by the Annual Benefit Fund for damages, the Motion for Summary Judgment as to these claims is due to be denied. The Health and Welfare Fund and the Pension Fund shall submit a schedule of attorney's fees to the court within twenty days from the entry of this Memorandum Opinion and corresponding Order. An

Order in accordance with this Memorandum Opinion will be entered contemporaneously

herewith.

    **DONE** this $\underline{3\mathrm{0th}}$ day of March, 2001.

                               Sharon Lovelace Blackburn

                               **SHARON LOVELACE BLACKBURN**
                               United States District Judge